## Swamp Branch Oil & Gas Company v. Rice.

(Decided Jan. 19, 1934.)

WHEELER & WHEELER for appellant.

FRED HOWES for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The issue in this case as ultimately presented by the pleadings is whether or not the appellant, the assignee of an oil and gas lease, has exercised due diligence to market the gas available from gas wells it has drilled upon the land of the appellee, the lessor, in said lease. The lower court found that it had not and awarded appellee judgment in the sum of $2,896.91, being the full amount sought, and being what the court found was the fair market value of that part of the gas which would have gone to the lessor under the lease as the royalty had the appellant marketed the gas in question. The lease so far as pertinent to this controversy provides:

"In consideration of the premises, the said party of the second part covenants and agrees: 1st—To deliver to the credit of the first parties heirs or assigns, free of cost, in the pipe line to which it may connect its wells, the equal ⅛ part of all oil produced and saved from the leased premises; and 2nd—to pay ⅛ part of all gas for the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said payment to be made on each well within sixty days after the commencing to use gas therefrom, as aforesaid, and to be paid every 30

days thereafter while the gas from said well is so used. First parties are to have free gas for one dwelling. * * *

"Provided, however, that this lease shall become null and void, and all rights hereunder shall cease and determine unless a well shall be completed on the said premises within 90 days from the date hereof, or unless the lessee shall pay at the rate of 25 cents per acre quarterly, in advance, for each additional three months such completion is delayed, from the time above mentioned for the completion of such well until a well is completed, and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease."

It is conceded that the appellant in due time began the development of the acreage involved and paid the rental of 25 cents per acre up to the bringing in of the first gas well on this property. Thereafter, 3 other wells were drilled and proved to be producing ones. At the time the appellant came into the ownership of this lease there was already a gas well upon the property, and this the appellant bought, thus making 5 wells it owned on this acreage. It has paid the appellee no further sums since the first well was drilled by it. The appellant owns a number of gas leases covering a large area adjacent to or near the acreage here involved and owns or controls about 18 producing wells in this territory. It has not been and is not now marketing any of the gas from any of these wells. The parties disagree as to the capacity of the 4 wells upon the appellee's property. The appellee's evidence would indicate that the combined capacity of these 4 wells is in excess of 2,500,000 cubic feet, and that, when such capacity is added to that of the other wells owned and controlled by it, the appellant has control over a potential volume of about 6,000,000 feet. The evidence of the appellant is that the capacity of these 4 wells will run about 1,500,000 feet, and that the capacity which it controls will run between three and four million. There are two, and only two, pipe lines in the vicinity of these wells available to the appellant; one about 3 miles away owned by the Inland Oil & Gas Corporation, and the other about 5 miles away owned by the Louisville Gas & Electric Company. There is no real controversy in the evidence con-

cerning the fact that it is impossible to introduce the gas from the wells of appellant into either of these lines without the aid of a booster, since the line pressure in both of these pipe lines is much greater than the rock pressure of any of appellant's gas wells. The appellant has no booster, nor has it any connecting line hooking up the production of its gas wells with either of the pipe lines mentioned. The parties differ radically as to what it would cost to install a booster and what the price of gas would have to be and how much gas would have to be sold to make the installation of a booster financially feasible for the appellant. But conceding that the evidence supports the contention of the appellee that, were the capacity of these wells utilized by the appellant and it obtained for such gas the price which appellee says is prevailing in the field, a booster could be erected by the appellant feasibly from a financial standpoint, we are yet confronted by the question whether or not, even if the appellant did have a booster, there would be a market for its gas. The evidence discloses very satisfactorily that the appellant has invested quite a sum of money in these and its other gas wells; that it undertook at once after these wells had been brought in to sell the production to the Inland Gas Company which after prolonged negotiations declined to take such production because it had all the gas it needed; that later the appellant tried diligently to sell its production to the Libby-Owens Glass Company, and failed, and then tried to sell the gas to the Carbide-Carbon Chemical Company for the purpose of extracting the chemicals therefrom; but, as the chemical company was unable to dispose of the gas after it had extracted such chemicals as it desired therefrom, the negotiations fell through. The appellant tried then to sell its gas to the Louisville Gas & Electric Company, and later to the Hamilton Oil & Gas Company, and still later to the United Fuel Gas Company. But in each case without success. The Louisville Gas & Electric Company would not receive into its pipe line any gas put into it from appellant's field by means of a booster because of a pro rata arrangement it had with the other gas producers in this region. It was impossible for the appellant without the booster to put any gas into the line of the Louisville Gas & Electric Company due to the difference between the line pressure of that pipe line and the rock pressure of appellant's wells. Appellant even employed appellee's son, who lived in Chicago, to dispose of its production, promising him a

good bonus if he could produce a purchaser. The son, too, has failed in such effort. The evidence leaves it clear to our minds that, even had appellant installed a booster and so made available for the pipe lines the production from the gas wells in question, it still could not have disposed of the gas. Until it was reasonably certain that the appellant could dispose of its gas, it was not required to install the booster which after its installation would have remained idle. The truth about the matter is that the gas companies interested in this field had made arrangements for all the gas they needed, and there simply was no market for the gas here in question. The appellant was not draining, nor were any neighboring gas companies draining, the gas from this field in which appellee's acreage is located. It was as much to the interest of appellant to market the gas as it was to that of the lessee. The appellant relies on the case of Rockcastle Gas Co. v. Horn, 241 Ky. 398, 44 S. W. (2d) 273; and the appellee upon the case of Carroll Gas & Oil Co. v. Skaggs, 231 Ky. 284, 21 S. W. (2d) 445. As we read the cases, there is no conflict between them. The Carroll Case lays down the rule which the Rockcastle Gas Company Case impliedly concedes that under a lease of the character here in question there is an implied obligation on the part of the lessee to exercise ordinary diligence to market oil and gas from producing wells. In the Rockcastle Case, as the opinion points out, no reliance was put on the failure of the gas company to exercise ordinary care in the sale of the gas produced, and, since no complaint was rested on that score, there was no rental due under the lease. In the Carroll Case, as the opinion discloses, there was evidence pro and con and enough to support the chancellor's finding that the gas company had not exercised due diligence in the marketing of the gas it had produced, and this was demonstrated by the fact that gas from offset wells on adjacent territory was being marketed by rival companies, and thus they were draining the gas from under the lease involved in the Carroll Case. The rule is clear that, if the lessee in a lease of this sort has exercised due diligence to market the gas and has been unable to do so, he is not liable for money rents or damages because of his failure to market the gas, but it is otherwise if he has failed to exercise such care. We are of opinion that the evidence in this case discloses that the appellant exercised due care and made diligent efforts to find a market for its gas and failed,

due to no want of diligence on its part, but simply because there was no present market for its gas; that the appellant would gladly have built a booster had there been any market for the gas after its pressure had been boosted, but had not built the booster because there was no such market; that what gas the Louisville Gas & Electric Company might have bought from appellant could not be delivered because the rock pressure would not put it into the pipe line of the Louisville Gas & Electric Company, and that company would not permit the appellant to boost the pressure with a booster.

There being no lack of diligence shown, then, under the Rockcastle Case, there was no money rent due the appellee under this lease, and hence the lower court erred in awarding the appellee the judgment it did.

The judgment is reversed, with instructions to dismiss the petition of the appellee.