R. C. GAZIN, Bess Gazin and Oil
Incorporated, a corporation,
Plaintiffs in Error,

v.

PAN AMERICAN PETROLEUM CORPORA-
TION, a corporation; Calvert Petroleum
Company, a corporation; Lee H. Armer;
Gulf Oil Corporation, a corporation; and
King-Stevenson Oil Company, Inc., a cor-
poration, Defendants in Error.

No. 39313.

Supreme Court of Oklahoma.

Dec. 19, 1961.

As Amended Jan. 11, 1962.

Rehearing Denied Jan. 16, 1962.

Shutler, Shutler & Baker, C. Everett
Murphy, Kingfisher, for plaintiffs in er-
ror.

Coleman Hayes, Norton Standeven,
Oklahoma City, Monnet, Hayes, Bullis,
Grubb & Thompson, Oklahoma City, of
counsel, for defendants in error.

HALLEY, Justice.

Plaintiffs, R. C. Gazin and his wife, own part of a section of land in Kingfisher County on which they gave a lease in May, 1954, to defendant, Lee H. Armer. Parties will be referred to as they appeared in the trial court and by name. Oil Incorporated, a corporation, took an oil and gas lease on plaintiffs' property in March, 1960, and is joined as a party plaintiff. Defendant Armer assigned parts of his interest under the 1954 lease to predecessors of the following corporate defendants: Pan American Petroleum Corporation, Calvert Petroleum Corporation and King-Stevenson Oil Company. The corporate defendant, Gulf Oil Corporation, owns an interest in other land located in the same section of land as plaintiffs, which section has been established as a drilling and spacing unit for gas by order of the Corporation Commission.

Plaintiffs brought this suit in May, 1960, to cancel the 1954 lease which lease contained a "thereafter" clause providing that it should remain in force for a primary term of five years "and as long thereafter as oil or gas or either of them is produced from said land by lessee." The usual requirement for the commencement of a well within one year or the payment of delay rentals was contained in the lease. The specified delay rentals were paid and accepted each year to and including that commencing May, 1958.

In October, 1956, defendant Armer completed a gas well on the leased land capable of producing in excess of 20 million cubic feet of gas per day and with an overall potential of approximately 4 billion cubic feet of gas. The well was shut in and no contract for sale of the gas was made until April, 1960. Defendants then attempted to go onto the leased premises to install equipment in order to produce and market the gas, but they were denied access by the Gazins. Defendants' answer and cross-petition therefore sought to enjoin the interference with their asserted rights and sought to quiet title to their leasehold estate as against plaintiffs. The trial court made written findings of fact and conclusions of law and entered judgment against plaintiffs and granted relief as prayed for by defendants. Plaintiffs appealed from the judgment and order overruling their motion for new trial.

Plaintiffs' contention is that the trial court erred in not cancelling the 1954 oil and gas lease because of its provisions and because of defendants' breach of an implied covenant to market the gas within a reasonable time after the well was completed in October, 1956. Plaintiffs advance two theories: first, that the lease terminated by its own provisions at the end of the primary term in May, 1959; or second, that the failure by defendants to execute a contract for sale of the gas before April, 1961, indicates an unreasonable length of time.

Plaintiffs cite Woodruff v. Brady, 181 Okl. 105, 72 P.2d 709, 113 A.L.R. 391; Anthis v. Sullivan Oil & Gas Co., 83 Okl. 86, 203 P. 187; and Curtis v. Harris, 76 Okl. 226, 184 P. 574, in support of the theory that the lease terminated by its own provisions at the end of the primary term in May, 1959. In each of those cases the evidence showed that there was no well on the leased premises during the primary term which was capable of producing in paying quantities. Those cases are not in point because in the case at bar a well was drilled and completed during the primary term which was capable of producing under the provisions of the lease.

Moreover, in the instant case the Gazins, lessors, received and accepted delay rentals on or before May, 1957, and May, 1958, as provided in the lease. They thereby waived any right which they may have had to claim that the lease terminated by its own provisions. If defendants could have delayed the commencement of a well during the primary term by payment of delay rentals and thereby deprived lessors of potential royalties, it is clear that the lessors may waive their right to demand

production or marketing of the product by accepting delay rentals during the primary term of the lease as was done here. The trial court found that there was no drainage of oil or gas from the leased premises to any other well or wells and that a prudent operator would not have drilled an additional well or wells for the production of oil. Cf. Eastern Oil Co. v. Beatty, 71 Okl. 275, 177 P. 104. Therefore, the trial court did not err in failing to declare that the lease terminated by its own provisions at the end of the primary term.

■ In support of their contention that defendants breached the implied covenant to market the gas within a reasonable time, the plaintiffs cite McVicker v. Horn, Robinson and Nathan, Okl., 322 P.2d 410, 411, 71 A.L.R.2d 1211, wherein we held:

"Where an oil and gas lease does not, in express terms, provide for the marketing of the product of a well drilled on the leased land, any covenant on the part of the lessee to do this can only be an implied one, in which instance said lessee has a reasonable time, after the completion of the well, to comply with such covenant."

This rule is now well recognized. State ex rel. Commissioners of Land Office v. Carter Oil Company of West Virginia, Okl., 336 P.2d 1086; Townsend v. Creekmore-Rooney, Okl., 358 P.2d 1103. It is applicable to the instant case.

What we have stated above concerning the payment by lessees of delay rentals to lessors is important in discussing the "reasonable time" within which the lessees have to comply with the implied covenant to market the product. As a result of lessors' waiver of their right to demand compliance with the implied covenant, the time which we must consider begins at the end of the primary term of the lease, which was May, 1959. In this connection, too, the actual length of the reasonable time depends on the facts and circumstances of each case. In State ex rel. Commissioners of Land Office v. Carter

Oil Company of West Virginia, supra [336 P.2d 1095], we said:

"In other words in the absence of a specific clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, capable of producing oil or gas in paying quantities will extend such term, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil or gas is produced and sold from such well. In such event if the producing and marketing thereof in such quantities from the well so completed is continued, the lease will extend until. the economic exhaustion of the product."

The main difference between the facts of the case at bar and the facts in the cases of McVicker v. Horn, Robinson and Nathan, supra, and State ex rel. Commissioners of Land Office v. Carter Oil Company of West Virginia, supra, is that in each of the latter two cases the lessee would have been required to expend considerable sums of money for equipment or pipeline in order to have marketed the gas any sooner than was done. In each of those cases, as in this case, the marketing was finally accomplished. In each of those cases this Court examined the evidence and found that it sustained the judgment of the trial court in refusing to cancel the oil and gas lease in question. In the present case, the lessee would not have been required to have expended any more than a nominal sum of money in order to have marketed the gas under a contract with Oklahoma Natural Gas Company, hereafter called Oklahoma Natural, whose line was less than one mile from the well. However, the contract which Oklahoma Natural proposed to make with lessees at all times up until April 1, 1960, provided that Oklahoma Natural would purchase gas "as and when needed and required" by Oklahoma Natural, with an initial price of 10¢ per thousand cubic feet

and with an escalator clause that would have raised the price to only 11¢ at the time of trial. Defendants knew from their own experience and that of other producers in the area that Oklahoma Natural was purchasing only a minimal amount of gas under such contracts, since there was no obligation to purchase any set amount.

Shortly after the completion of the well, the lessees contacted another potential purchaser, Cities Service Gas Company, whose line was approximately 18 miles from the well. Cities Service would not negotiate a contract until such time as defendants could establish reserves in excess of 40 billion cubic feet of gas. Defendants continued negotiations with Oklahoma Natural and received the promise of a much more favorable contract calling for an initial price of 15¢ per thousand cubic feet of gas and obligating Oklahoma Natural to take or pay for five percent of the reserves established for each well each year, if defendants could dedicate an eight-township area with reserves amounting to 40 billion cubic feet of gas under such contract.

The defendants participated in drilling, drilled, and re-worked a number of wells in the area and acquired additional acreage at considerable expense. They continued to negotiate with Oklahoma Natural and finally Oklahoma Natural lowered its demand under such a contract to an establishment of reserves of only 20 billion cubic feet of gas in a dedicated area of eight townships.

Defendants established the 20 billion cubic feet of reserves in January, 1960. Details of the contract were worked out between defendants and Oklahoma Natural and the contract was signed on April 1, 1960. Since that time Oklahoma Natural has been ready, willing and able to purchase gas from the well on the leased premises in accordance with the contract.

The trial court found that the defendants exercised reasonable diligence in seeking and obtaining a satisfactory market within a reasonable time under the facts and circumstances. We have examined the evidence and weighed it and we do not believe that the findings and judgment are against the clear weight of the evidence.

The judgment is affirmed.

WILLIAMS, C. J., BLACKBIRD, V. C. J., and DAVISON, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.