**J.W.C. DAVIS and Gwendolyn Davis, Petitioners/Cross–Respondents,**

**v.**

**R.K. CRAMER, Richard Haines, Irene M. Light, Louis S. Madrid, Gary Sandlin and Sandlin Oil Corp., Respondents/Cross–Petitioners.**

**No. 90SC133.**

Supreme Court of Colorado, En Banc.

March 25, 1991.

Rehearing Denied April 15, 1991.

Samuel L. McClaren, P.C., Samuel L. McClaren, Tucson, Ariz., for petitioners/cross-respondents.

Burns, Wall, Smith and Mueller, P.C., George W. Mueller, Denver, for respondents/cross-petitioners.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *Davis v. Cramer,* 793 P.2d 605 (Colo.App.1990), and now reverse and remand with directions. We limited our review to a determination of whether an implied duty to market gas arises during the primary term of an oil and gas lease, and whether the court of appeals erred in remanding this case to the

trial court on the issue of breach of the drilling clause.

This dispute arises out of a complex series of claims and counterclaims, which is essentially a quiet title action pursuant to C.R.C.P. 105. The issues in this case depend upon the interpretation that is to be afforded to the habendum clause and implied covenants in the oil and gas lease between J.W.C. and Gwendolyn Davis, as lessors, and the remaining parties, including Gary Sandlin and Sandlin Oil Corp., as lessees,[1] and the rights created by the Allensworth oil and gas lease.

There is no standard oil and gas lease, and each lease must be construed to give effect to the particular wording that has been agreed to by the parties. 2 Kuntz, *The Law of Oil and Gas*, at § 18.2 (1989) (hereinafter Kuntz). In addition, certain implied covenants in oil and gas leases arise out of the lessor/lessee relationship. We have previously noted that the law of oil and gas is unlike any other area. *Spaulding v. Porter*, 94 Colo. 496, 31 P.2d 711 (1934).

On March 16, 1978, the Davises filed an action against Sandlin and the other lessees claiming, among other things, that the lease had terminated because of the lessee's breach of the implied covenant to market oil and gas produced from the Davis lease. Sandlin counterclaimed for damages resulting from the Davises' refusal to allow him onto the property to drill for oil or gas. On May 23, 1986, the district court found that the lease had terminated but that Sandlin had a property interest by virtue of a lease between Sandlin and a third party, the Allensworths.

The district court found that on November 1, 1968, the Davises entered into an oil and gas lease with Roy Sharpe for a primary term of ten years (the Davis lease). The Davis lease included all mineral rights, except a one-half mineral interest in a quarter section of the property that was reserved by the Allensworths, who were the

Davises' predecessors in interest.[2] The habendum clause in the Davis lease provided for a primary term of ten years "and as long thereafter as oil and gas or other minerals are produced from said land by the lessee ..." (the secondary term). There was also a shut-in royalty clause, which provided: "When no reasonable or convenient gas market is available, the lessee may pay $1.00 per acre per annum for the total acres allotted to each while held as a shut-in well."

Finally, the lease contained a drilling clause that stated that if no well was commenced by November 1, 1969, the lease would terminate unless the lessee paid a rental charge of $1.00 per acre, which would extend the lease for twelve months. The lessee could continue paying delay rental charges each year thereafter to keep the lease in effect if no well was drilled. The agreement stipulated that if a well was drilled but was a "dry hole," the lease would terminate unless the lessee drilled a second hole or resumed payment of delay rentals.

By May 1972, the Davis lease had been assigned to Amoco Production Co. and Equity Oil Co., and the same two companies entered into a separate agreement with the Allensworths for their mineral interest, which had a primary term of five years. On July 21, 1972, drilling was commenced by either Marlis Production, Nebraska Drillers, or by both companies. The trial court found that the well was capable of producing oil and gas for purposes of the habendum clause, and that it was completed in October 1972.

Through a series of assignments from September 1972 through June 1973, the interest in the two leases was split between Amoco, Equity Oil, and Morris Fox. Sometime prior to 1973, Amoco and Equity Oil began paying what were termed annual delay rental payments attributable to the interests of Amoco Production and Equity Oil. Those payments were made annually

---

1. The oil and gas lease was to a 320 acre tract in Adams County described as the SE¼, sec. 30, T 2 S, R 53 W, and the SW¼, sec. 2, T 3 S, R 64 W.

2. The Allensworths own a one-half mineral interest in the SE¼ of section 30.

through October 31, 1977. There is no finding, however, that Fox made any payments, or that the well was producing oil and gas during the time that he held a leasehold interest. The interests in the leases remained the same until 1977, when the Allensworth lease to Amoco and Equity Oil expired by its own terms.

In September 1977, Fox assigned his rights to a group of investors including Gary Sandlin and Sandlin Oil. The following year, on March 16, 1978, the Davises commenced this action to obtain an order that the Davis lease had terminated. Three days later, Sandlin acquired the lease rights from the other investors. On June 26, 1978, Sandlin entered into a new lease with the Allensworths for their mineral interest. Thereafter, between October 1978 and January 1979, Sandlin acquired practically all of the interest of the other lessees under the Davis lease.

On either October 30 or 31, 1978, one or two days before the end of the primary ten-year term of the Davis lease, gas from the well was sold to Panhandle Eastern, through a gas line constructed in 1975.

The March 16, 1978, action by the Davises alleged that the Davis lease terminated, and that Sandlin had no right to drill for oil and gas on that land. Sandlin counterclaimed that the lease was still in effect, and that he had a leasehold interest in the land by virtue of the Allensworth lease. The trial court found that the Davis lease expressly required an annual delay rental payment unless the first well was not a dry hole. The court then ruled that a well capable of production in paying quantities was required to satisfy the drilling clause. The court held that Sandlin and his predecessors had produced oil in paying quantities during the primary term of the lease, in October 1978. The court said, however, that the well was capable of production prior to 1973, and so was a shut-in gas well from that date until it started to produce in 1978. The court concluded that, notwithstanding the shut-in royalty clause, there was an implied covenant in the lease to exercise due diligence to produce and mar-

ket the oil and gas that operated during the primary term of the lease.

Because no gas was marketed until 1978, even though production was possible in 1973, the court ruled that the lease had expired on November 1, 1974, for failure to pay shut-in royalties after November 1, 1973. The court construed the shut-in royalty clause as a special limitation on the leasehold estate, so shut-in royalty payments were necessary to maintain the lease in force. In addition, the court found that, even if the shut-in royalty payments were optional, Sandlin and his predecessors had breached the implied covenant to market gas by waiting until 1978 to produce and market gas, although there was an available pipeline to sell the gas in 1975. This provided an additional ground for the court's conclusion that the lease had terminated. Finally, the court held that the Davises had improperly prevented Sandlin from entering the property to drill, since Sandlin still had the interest granted by the Allensworth lease.

The court of appeals affirmed the award of damages to Sandlin based on the Davises' unreasonable interference with Sandlin's right under the Allensworth lease to enter the property and drill. The court, however, held that in 1975, the Davis lease was still in existence and had not expired. 793 P.2d at 607. The opinion also held that there was no general duty to produce gas during the primary term of the lease, and that the shut-in royalties were the constructive equivalent of production and therefore optional. The court ruled that the implied duty to market gas did not arise during the primary term of the lease. The Davises' claim that the lease had expired because of failure to comply with the drilling clause was remanded to the trial court for further findings.

I

The fundamental purpose of an oil and gas lease is to provide for the exploration, development, production, and operation of the property for the mutual benefit of the lessor and lessee. 5 Kuntz, *supra,* at § 55.1. "Where the purpose of the lease is

thus disclosed, but the lease does not itself contain express provisions creating duties in the lessee to do such acts as are necessary for the accomplishment of that purpose, the law implies them." 2 Summers, *Oil and Gas,* § 395 (1959) (hereinafter Summers). It is those implied duties that are at issue here.[3]

Most commentators divide the implied covenants into four categories: exploration, development, production (including marketing), and protection against drainage. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases,* § 4 (2d ed. 1940); Kulp, *Oil and Gas Rights,* § 10.66 (1955); Sullivan, *Handbook of Oil and Gas Law,* §§ 87–93 (1955); *see* 5 Kuntz, *supra,* at § 55.1. Another commentator divides production into the duty to produce and to market. Brown, *The Law of Oil and Gas Leases,* § 16.02 (1958). Regardless, the necessity of the duty to market "is obvious in order that the lessor may receive the consideration for the lease, that is, the royalties which are to be paid." 2 Summers, *supra,* at § 400; *see also* Hemingway, *Law of Oil and Gas,* § 6.4 (1983).

■ In *Mountain States Oil v. Sandoval,* 109 Colo. 401, 407–08, 125 P.2d 964, 967 (1942), we recognized that the implied covenants in an oil and gas lease were "to drill, to develop after discovery of oil or gas in paying quantities, to operate diligently and prudently[,] and to protect the leased premised against drainage." (Citation omitted.) Embodied in the covenant to operate diligently and prudently is the implied covenant to market. *Mountain States* held that there was sufficient evidence to support the trial court's finding that the lessee had breached the implied covenant to operate diligently and prudently when the lessee had failed to explore, develop, or drill a portion of the land for fourteen years. *Id.* at 408–09, 125 P.2d at 967. Although the lease had a similar habendum clause as the one at issue here, *Mountain States* did not discuss whether the implied covenant to operate diligently arose during the primary term. The focus instead was on the length of time in which the land was sitting idle. Time is of the essence in an oil and gas lease, and "[t]herefore, such a lease or option is properly construed strongly against the lessee, so as to secure such speedy development." *Id.* at 409, 125 P.2d at 967.

The parties to this action agree that an implied covenant to market exists at some point, but both have failed to find support for either the position that the covenant operates, or the position that it does not operate, in the primary term of the lease. Sandlin contends that he produced and marketed oil in the primary term, albeit two days before that term expired, and that he therefore satisfied the production and marketing requirements in the lease. The Davises, on the other hand, complain that waiting until nearly the end of a ten-year primary term to market the oil and gas was unreasonable and therefore breached the covenant to market.

■ In *Gazin v. Pan American Petroleum Corp.,* 367 P.2d 1010 (Okla.1961), the Oklahoma Supreme Court held:

> Where an oil and gas lease does not, in express terms, provide for the marketing of the product of a well drilled on leased land, any covenant on the part of the lessee to do this can only be an implied one, in which instance said lessee has a

---

3. The expense of oil exploration and development, typically a risky venture, was beyond the resources of the typical landowner. Provision was therefore made for the payment to the lessor of a royalty on any oil found. Many of the early leases had an annual rental rather than royalty on gas since gas was not valuable. The lessee bore all expenses. This led to conflicts between the lessor and the lessee since the lessor wanted faster development and more income and the lessee wanted to minimize expenses. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases,* § 1 (2d ed. 1940).

> Recognition of the fundamental purpose of the lease and the resultant general duty on the part of the lessee and on the part of the lessor forms the basis for recognizing that a continuing relation exists between the lessor and lessee of an oil and gas lease and that there are identifiable rights and duties which are intended to arise out of and to be incident to such relation. The rights and duties which are incident to the continuing relation of the oil and gas lessor and lessee are the substance of the doctrine of implied covenants.

5 Kuntz, *supra,* at 4.

reasonable time, after completion of the well, to comply with such covenant. *Id.* at 1012 (quoting *McVicker v. Horn, Robinson and Nathan,* 322 P.2d 410, 411 (Okla.1958)). *Gazin* held that, although the lessors would normally have the right to demand compliance with the implied covenant to market in the primary term, the acceptance of delay rental payments operated as a waiver of that right.[4] *Id.* The diligence of the lessee's efforts and the reasonable probability of success are factors to be taken into consideration when determining what is a "reasonable time." *Flag Oil Corp. v. King Resources Co.,* 494 P.2d 322, 325 (Okla.1972). *See also Brimmer v. Union Oil Co.,* 81 F.2d 437 (10th Cir.) (recognizing implied duty to market), *cert. denied,* 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391 (1936); *Brewster v. Lanyon Zinc Co.,* 140 F. 801 (8th Cir.1905) (lease contained implied covenant to use reasonable diligence to explore for, develop, and produce oil and gas); *Molter v. Lewis,* 156 Kan. 544, 134 P.2d 404 (1943) (recognizing implied covenant to market gas); *Swamp Branch Oil & Gas Co. v. Rice,* 253 Ky. 733, 70 S.W.2d 3 (1934) (same); *Severson v. Barstow,* 103 Mont. 526, 63 P.2d 1022 (1936) (same); *Young v. Dixie Oil Co.,* 647 S.W.2d 235 (Tenn.App.1982) (implied duty imposed upon lessee to diligently explore, operate, and market the product is a continuing one, but the payment of shut-in royalties under the lease extends the lease into the secondary term); *Reid v. Gulf Oil Corp.,* 323 S.W.2d 107 (Tex.Civ.App.1959) (recognizing implied duty to produce and market), *aff'd,* 161 Tex. 51, 337 S.W.2d 267 (1960); *Meagher v. Uintah Gas Co.,* 112 Utah 149, 185 P.2d 747 (1947) (same); *Berry Energy Consultants and Managers, Inc. v. Bennett,* 331 S.E.2d 823 (W.Va.1985) (payment of shut-in royalties prevents a finding of abandonment but does not relieve the lessees of their implied obligation to exercise reasonable diligence in marketing gas). The obligations of lessees are not fulfilled by the drilling of a well since the lessees' duties include marketing of the

gas discovered in paying quantities from the wells drilled. *Cole Petroleum Co. v. United States Gas & Oil Co.,* 121 Tex. 59, 41 S.W.2d 414 (1931). *Libby v. De Baca,* 51 N.M. 95, 179 P.2d 263 (1947), held that a lessee must proceed with reasonable diligence, from the standpoint of a reasonably prudent operator, to market oil and gas after a well had been drilled and oil or gas produced. *See also* Annotation, *Duty of Lessee or Assignee of Oil or Gas Lease as Regards Marketing or Delivery for Marketing of Oil or Gas Discovered,* 86 A.L.R. 725 (1933); 71 A.L.R.2d 1219 (1960).

Although most cases dealing with breach of implied covenants to market arise factually during the secondary term, Sandlin has failed to adduce a sound policy reason why those covenants should not apply during the primary term as well. Under Sandlin's interpretation, a given property could sit idle and bring no profit for the entire length of the primary term, in this case ten years, so long as the lessee sold any amount of oil or gas at some time before the primary term expired. Presumably, that sale could take place one hour before the end of the term, and the conditions of the contract would be satisfied unless there was a specific provision requiring the lessee to market the gas within a different period of time. That interpretation would defeat the very purpose of the lease, which is to benefit both the lessee and lessor.

The court of appeals cited *Gillette v. Pepper Tank Co.,* 694 P.2d 369 (Colo.App. 1984), in support of its ruling that an implied covenant to market did not arise during the primary term of the lease. *Davis,* 793 P.2d at 607. The Davises contend that the court of appeals' interpretation of *Gillette* is incorrect. We agree. In *Gillette,* the primary lease term was only four months, and the lessors had alleged that the lease had terminated during the secondary term, unlike the case here. The court of appeals in *Gillette* said that the basis for implied covenants

not before us.

4. The question of what effect delay rental payments have on implied covenants in Colorado is

is founded upon the concept that in the secondary term of an oil and gas lease: "[t]he work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor."

*Gillette,* 694 P.2d at 372 (citations omitted). Because the court of appeals did not have occasion in *Gillette* to decide whether implied covenants arose during the primary lease term, any language to the effect that they do not is *dicta* and is not controlling.

■■■ We reverse the court of appeals and hold that the implied covenant to market oil and gas arises in the primary term of the lease. Upon remand, the court of appeals must review the trial court's determination that this implied covenant was breached. The covenant to market requires that the lessees exercise reasonable diligence to market the products. Reasonable diligence is "whatever, in the circumstances, would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee." *Gillette,* 694 P.2d at 372. The existence of reasonable diligence is primarily a question of fact. The court of appeals also must determine whether the trial court properly decided that the equitable remedy of cancellation was the appropriate remedy for the breach of this implied covenant.

## II

■■ In his cross-petition, Sandlin complains that the court of appeals erred in remanding the question of whether the drilling clause had been breached back to the trial court for further findings. That clause provided that if no well was drilled by November 1, 1969, the lease would terminate unless the lessee paid a rental charge of $1.00 per acre, which would extend the lease for twelve months. The lessee could continue paying rental charges each year thereafter to keep the lease in effect if no well was drilled. Sandlin argues that there were sufficient findings by the trial court to review whether the drilling clause had been satisfied, since the trial court specifically found that the

Davis 1–30 Well was completed in October, 1972. The parties have agreed by stipulation that despite the production of oil, the Davis No. 1–30 Well was primarily a gas well for purposes of the construction of the Davis Lease and the Court so finds. One of the controverted issues is whether the Davis No. 1–30 Well was a well capable of production of oil and gas for the purpose of the habendum clause. This is a mixed issue of law and fact, but for reasons discussed *infra,* the Court so finds.

The Davises agree that there are adequate findings on the drilling clause, but argue that the court of appeals was referring to the dry hole clause, which requires payment of rent should the first well be a dry hole, unless a second well is commenced within twelve months from the expiration of the last rental period.

Regardless of which party is correct, there are adequate factual findings by the trial court to determine on appeal whether either the drilling or the dry hole clauses were satisfied. The plain language of the contract requires a well to be commenced within one year, which both parties stipulate was commenced. The dry hole clause is not reached, under the contract, unless that first well is dry. *See* 3 Kuntz, *supra,* at § 33.1(a) (discussing what must be done by the lessee to preserve the lease after drilling the first well). The trial court expressly found that the well did produce sufficient gas to satisfy the habendum clause, which would be inconsistent with a finding that the well was a dry hole for either the drilling clause or the dry hole clause. The trial court's conclusion that the lease terminated in 1975 rests on the finding that the well was capable of producing paying quantities of gas, but that the lessees unreasonably failed to market that gas.

Since the trial court made sufficient findings of fact on compliance with the drilling clause, the court of appeals can review any legal issues relating to such compliance. That court erred by remanding the question back to the trial court for further findings.

## III

Accordingly, we reverse the judgment of the court of appeals and remand this case back to the court of appeals for further proceedings consistent with this opinion.