The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
May 13, 2021

## 2021COA67

**No. 19CA2040, *Board of County Commissioners of Boulder County v. Crestone Peak Resources Operating LLC* — Energy and Environment — Oil and Gas — Commercial Discovery Rule**

A division of the court of appeals considers the meaning of "production" as that term is used in oil and gas leases. The division holds that production means capable of producing oil or gas in commercial quantities. Applying this definition, the division concludes that two oil and gas leases never terminated because wells on the land subject to the leases never stopped producing. The division therefore affirms the district court's judgment, granting summary judgment to the defendant.

Court of Appeals No. 19CA2040
Boulder County District Court No. 18CV30924
Honorable Thomas F. Mulvahill, Judge

Board of County Commissioners of Boulder County, Colorado,

Plaintiff-Appellant,

v.

Crestone Peak Resources Operating LLC,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GRAHAM*
Tow and Taubman*, JJ., concur

Announced May 13, 2021

Ben Pearlman, County Attorney, Katherine A. Burke, Senior Assistant County
Attorney, David Hughes, Deputy County Attorney, Catherine Ruhland, Deputy
County Attorney, Boulder, Colorado; Hamre, Rodriguez, Ostrander & Dingess,
P.C., Steven Louis-Prescott, Denver, Colorado, for Plaintiff-Appellant

Jost Energy Law, P.C., Jamie L. Jost, Kelsey H. Wasylenky, Denver, Colorado;
Wheeler Trigg O'Donnell LLP, Joel S. Neckers, Theresa Wardon Benz, Andrew
W. Myers, Denver, Colorado, for Defendant-Appellee

Julia Guarino, Boulder, Colorado, for Amicus Curiae Getches-Green Natural
Resources and Environmental Law Clinic, University of Colorado Law

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     This appeal centers on one question: What constitutes "production" under an oil and gas lease? The Board of County Commissioners of Boulder County (Boulder) sued Crestone Peak Resources Operating LLC (Crestone), alleging that wells subject to two of Crestone's oil and gas leases had stopped producing, and therefore that the leases had terminated. The district court disagreed and granted summary judgment to Crestone.

¶ 2     We hold that production means capable of producing oil or gas in commercial quantities. Thus, the district court correctly concluded that Crestone's wells never stopped producing and, consequently, the leases never lapsed. We therefore affirm.

## I.    Background

### A.    The Haley and Henderson Leases

¶ 3     This case involves two oil and gas leases that were negotiated in the 1980s. Predecessors-in-interest to Boulder and Crestone executed an "Oil and Gas Lease" for the Haley property in Boulder County (Haley lease). The Haley lease contains a habendum clause, stating "this lease shall remain in full force for a term of Two (2) years from May 14, 1980 and as long thereafter as oil or gas or

1

either of them, is produced from said land . . . or the premises are being developed or operated."[1]

¶ 4    Similarly, in 1982, the predecessors-in-interest executed an "Oil and Gas Lease" for the Henderson property in Boulder County (Henderson lease).  The Henderson lease's habendum clause states "this lease shall remain in force for a term of two years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith or drilling operations are continued as hereinafter provided."

¶ 5    Both leases contain cessation of production clauses (cessation clauses).  The Haley lease provides that "[i]f, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for re-working or drilling a well within sixty (60) days from such cessation."  The Henderson lease contains a similar cessation clause that allows for "drilling or re-working" to

---

[1] A habendum clause, generally speaking, defines the duration of an oil and gas lease.  *Davis v. Cramer*, 837 P.2d 218, 222 (Colo. App. 1992) (*Davis II*).

2

save an otherwise nonproducing well, except that the grace period is ninety days.

¶ 6    Both leases contain clauses for shut-in royalties when only gas is produced.  A well is typically "shut-in" when it is turned off temporarily for maintenance or when the sale of hydrocarbons is not economically feasible.  The Haley lease provides that when gas is "not sold or used for a period of one year, lessee shall" make payments "on the anniversary date of this lease following the end of each such year during which gas is not sold or used, and while said royalty is so paid or tendered this lease shall be held as a producing property" under the habendum clause.  The Henderson lease's shut-in clause is similar:

> Where gas from a well capable of producing gas is not sold or used, Lessee may pay or tender as royalty to the royalty owners One-dollar per year per net royalty acre retained hereunder, *such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in* and thereafter on or before the anniversary date of this lease during the period such well is shut in.  If such payment of tender is made, it will be considered that gas is being produced within the meaning of this lease.

(Emphasis added.)

3

## B.    Lease History and Operation

¶ 7    Crestone's predecessor-in-interest was Encana Oil & Gas (USA), Inc. (Encana). Encana drilled two wells on the Haley property. Both wells contained commercially viable quantities of oil and gas, and both have maintained that viability through the present lawsuit. The Henderson lease had one well, which also contained commercially viable quantities of oil and gas.[2] We refer to the three wells collectively as "the wells."

¶ 8    In 1993, Boulder County voters approved a county-wide sales and use tax to fund the acquisition of real property to further the county's conservation efforts. Sometime thereafter, Boulder purchased the property and mineral rights subject to the Haley and Henderson leases, becoming the successor lessor for both.

---

[2] Encana permitted one well on the land subject to the Henderson lease but never commenced drilling. Instead, Encana signed a "Declaration of Unitization" in 1983 that combined operations of the property under the Henderson lease with a neighboring property, which contained a well. The parties agree that because the Henderson lease's habendum clause is satisfied by production on "said leased premises *or on acreage pooled therewith*," the neighboring property's well satisfied production under the Henderson lease. (Emphasis added.)

¶ 9     Encana did not collect or store the gas produced by the wells on site, instead selling and delivering the gas directly to Anadarko Petroleum Corporation (Anadarko) through its pipeline, which was connected to the wells.

¶ 10     In March 2014, Anadarko informed Encana that it needed to temporarily close its sales pipeline due to a maintenance issue. It is undisputed that gas and oil were available from Encana's wells during this temporary halt in extraction. Boulder does not allege that there was another market for Encana's gas. During the temporary shutdown, Encana still worked the premises, including regular site visits, pressure measurements, record keeping, and maintenance. One hundred twenty-two days later, Anadarko told Encana that repairs were complete, so Encana restarted the flow of gas and resumed selling to Anadarko.[3]

¶ 11     Encana (and later Crestone) continued extracting and marketing oil and gas from the Haley and Henderson wells for

---

[3] The record does not disclose the length of time (if any) between Anadarko resuming operations and Encana resuming the extraction and marketing of its gas. Crestone states that "Encana promptly restarted the flow of gas," a characterization not challenged by Boulder. This factual uncertainty is not material to our analysis.

another six years. (Crestone purchased Encana's rights under both leases in 2015, becoming the successor lessee.) Over this period, Boulder accepted tens of thousands of dollars in royalty payments from Crestone, including while this lawsuit was pending.

¶ 12    Boulder sued Crestone in February 2019 for failure to surrender the leases, surface and mineral trespass, and unjust enrichment.[4] Boulder's theory was that the leases terminated during the extraction pause in 2014. Crestone filed two motions for summary judgment, one pertaining to each lease.

¶ 13    The district court granted both motions for summary judgment for the reasons Crestone articulated in its motions. Among other things, the district court adopted Crestone's argument that Encana's temporary extraction pause did not constitute a cessation in production under either lease.

## II.    Analysis

¶ 14    Boulder's primary contention is that production stopped under the leases during the 2014 pause, thereby terminating the leases.

---

[4] Apparently, the suit was prompted by Crestone's application with the Colorado Oil and Gas Conservation Commission to expand its oil and gas operations under the Haley and Henderson leases.

Specifically, Boulder argues that production means extraction of hydrocarbons from the ground, which did not occur during the pause.

¶ 15 Boulder also advances, but then retracts, a position raised by a group of law professors, writing as amici curiae, that production requires both the extraction and *marketing* of hydrocarbons. Because Boulder repudiates this position in its reply brief, we cannot address it. *Galvan v. People*, 2020 CO 82, ¶ 45 (holding that we must "decide only [the] questions presented by the parties"); *Gorman v. Tucker*, 961 P.2d 1126, 1131 (Colo. 1998) ("We will not consider issues raised only by amicus curiae and not by the parties.").

### A. Standard of Review

¶ 16 We review oil and gas leases like any other contract. *See Garman v. Conoco, Inc.*, 886 P.2d 652, 656-57 (Colo. 1994). "The interpretation of a contract presents a question of law." *Sch. Dist. No. 1 v. Denver Classroom Tchrs. Ass'n*, 2019 CO 5, ¶ 11. Our review is therefore de novo. *Id.*

## B. Interpretation of Oil and Gas Leases

¶ 17    "The fundamental purpose of an oil and gas lease is to provide for the exploration, development, production, and operation of the property for the mutual benefit of the lessor and lessee." *Davis v. Cramer*, 808 P.2d 358, 360 (Colo. 1991) (*Davis I*). An oil and gas lease "is properly construed strongly against the lessee." *Mountain States Oil Corp. v. Sandoval*, 109 Colo. 401, 409, 125 P.2d 964, 967 (1942) (citation omitted). More fundamentally, oil and gas leases "are construed most favorably to development." *Id.* (citation omitted).

¶ 18    Each oil and gas lease "must be construed to give effect to the particular wording that has been agreed to by the parties." *Davis I*, 808 P.2d at 359. More broadly, "[a] court should interpret a contract 'in its entirety . . . seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless.'" *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009) (citation omitted).

## C. Production Does Not Include Extraction

¶ 19    A division of this court held that "production" under a habendum clause "is satisfied by discovery in commercial

quantities." *Davis v. Cramer*, 837 P.2d 218, 222 (Colo. App. 1992) (*Davis II*). The division reasoned further that only in jurisdictions "in which marketing is an essential part of production" does production require that oil or gas "be removed from the earth." *Id.* We refer to *Davis II*'s holding as the commercial discovery rule.

¶ 20 Boulder argues that *Davis II* is inapplicable here because Boulder's leases, unlike the lease in *Davis II*, contain a cessation clause. We disagree. The question here, as was the question there, is the meaning of production. We construe contracts to give consistent, harmonious effect to all their parts. *Copper Mountain*, 208 P.3d at 697. We therefore construe production the same in the cessation clause as we do in the habendum clause, and it makes no difference that the contract in *Davis II* may not have had a cessation clause.

¶ 21 Boulder next argues that *Davis II*'s rationale should not be applied here because that case concerned a dispute about the primary term of the lease, not the secondary. We reject this argument because the distinction is irrelevant. Production is production, whether in the primary or secondary term of an oil and gas lease.

¶ 22    We therefore adopt and apply the commercial discovery rule of

*Davis II.  See People v. Smoots*, 2013 COA 152, ¶ 20 ("We are not

obligated to follow the precedent established by another division,"

but "we give such decisions considerable deference."), *aff'd sub*

*nom. Reyna-Abarca v. People*, 2017 CO 15.

¶ 23    The specific terms of the Haley and Henderson leases support

our holding.  While the habendum and cessation clauses discuss

production of hydrocarbons, other clauses explicitly contemplate

above-ground activity.  Under the Haley lease, for example, royalty

payments are due on oil "produced and saved," not on production

alone.  The Henderson lease also provides that royalties are due on

oil "produced and saved."

¶ 24    Admittedly, the leases do discuss "capable of production," in

addition to "production."  But the cessation and shut-in royalties

clauses in both leases compel the conclusion that those terms are

functionally synonymous.

¶ 25    The cessation clauses in both leases state that if production

ceases, the lease will not terminate if the lessee undertakes

reworking or drilling.  A leading treatise interprets this type of

cessation clause in the following way:

> The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, *the parties must have intended that the clause would become operative if a dry well is drilled or if a producing well ceases to be capable of producing in paying quantities*.

2 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 26.13[b] (emphasis added). We agree with the treatise. When drilling or reworking operations are stipulated as a remedy for cessation of production, the parties must have intended that production meant capable of production, such that a well that was no longer capable of production could be remedied by reworking or new drilling. *See id.*

¶ 26　　Most important to our conclusion is the fact that Boulder's position (that production includes extraction) renders the leases' clauses for shut-in royalties inoperative. We must avoid this result and instead interpret the leases to give effect to all their contractual provisions. *Copper Mountain*, 208 P.3d at 697 ("[A] court should interpret a contract 'in its entirety . . . seeking to harmonize and to

11

give effect to all provisions so that none will be rendered meaningless.'") (citation omitted).

¶ 27     The Haley lease's shut-in clause applies only after gas is not sold or used for one year. But here, the lessee's extraction interruption lasted only four months. If production included extraction, triggering lease termination under the cessation clause after sixty days, then the lessee would never be able to utilize the shut-in royalties clause. The Oklahoma Supreme Court recognized this problem when analyzing marketing under a similar lease:

> If we were to interpret the cessation of production clause to require marketing, then the shut-in royalty clause would be rendered meaningless. The lessees would not be able to shut-in the well and pay shut-in royalties to keep the lease viable because the cessation of production clause would mandate continuous marketing of gas. Thus, such a construction of the cessation of production clause would nullify the provisions of the shut-in royalty clause.

*Pack v. Santa Fe Mins., a Div. of Santa Fe Int'l Corp.*, 869 P.2d 323, 330 (Okla. 1994). The Oklahoma Supreme Court's reasoning is equally applicable when considering whether production includes extraction.

¶ 28    And it is even clearer under the Henderson lease's shut-in royalties clause that production cannot mean extraction. That clause permits shut-in royalties "to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in." This language clearly contemplates the payment of shut-in royalties after ninety days; but if production included extraction, the lessee would never be able to utilize the clause for shut-in royalties because the cessation clause's ninety-day termination would kick in. That is, if production meant extraction, then the lease would terminate by the terms of the cessation clause, without ever allowing for the payment of shut-in royalties before the next anniversary date.

¶ 29    This result is avoided under the commercial discovery rule; both the cessation and shut-in royalties clauses are given effect. A lease terminates under the cessation clause if it is incapable of producing in paying quantities. If there remains a viable commercial discovery of hydrocarbons, but there is no extraction or marketing, then the lessee may pay shut-in royalties to satisfy its implied duty to market. The *Davis II* division explained how shut-in royalties could function in this type of situation:

13

> [A] shut-in royalty clause can be inserted to provide an additional special limitation, which requires payment of the shut-in royalty if gas is not marketed. It may also be inserted to prevent forfeiture for failure of the lessee to exercise diligence in marketing, may extend the reasonable time within which the lessee is required to market the product, or may remove doubt regarding the time within which marketing must be accomplished . . . .

837 P.2d at 223.

¶ 30 To illustrate these principles, consider the facts of this case. If the Anadarko pipeline interruption had lasted more than a year, Encana could have paid shut-in royalties. Under the Henderson lease, these payments were discretionary, but Encana could have paid them in the event that it was concerned with its failure to comply with the implied covenant to market. Under the Haley lease, shut-in royalties were mandatory, so Encana would have been legally required to make them. In this hypothetical, contrary to Boulder's assertion, the cessation clauses retain full effect: if the wells dried up or in some way no longer contained accessible commercial quantities of hydrocarbons, production would have ceased, triggering the cessation clauses. But that was undisputedly not the case here.

¶ 31    While Boulder and the amici attempt to classify the commercial discovery rule as the minority position — treating discovery plus some combination of extraction or marketing as the majority position — for the reasons given above, we apply the commercial discovery rule.[5]  In fact, the treatises cited by Boulder do not characterize Colorado as a "minority" state.  Our review of the states dealing with this issue does not reveal a consensus.  If it is a minority rule, it is nonetheless an approach to production that finds support among a number of our sister states.  *See Hall v. Galmor*, 2018 OK 59, ¶ 21, 427 P.3d 1052, 1063 ("The shut-in well is capable of production in paying quantities such that the lease remains viable under the habendum clause . . . ."); *Sandtana, Inc. v. Wallin Ranch Co.*, 2003 MT 329, ¶ 37, 80 P.3d 1224, 1231 ("*[D]iscovery* of gas within the primary term was sufficient to continue the lease and . . . extraction was not necessary where there was no present market."); *Greene v. Coffey*, 689 S.W.2d 603, 605 (Ky. Ct. App. 1985) ("'[P]roduction' is broadly defined to include

---

[5] In Boulder's reply brief, it references a number of other definitions of production from a variety of sources.  Regardless, for the reasons articulated in the opinion, those extraneous definitions do not dictate a different result.

15

. . . the discovery of oil during the initial term of the lease coupled with the exploitation and removal of the discovered oil within a reasonable time thereafter."); *S. Penn Oil Co. v. Snodgrass*, 76 S.E. 961, 967 (W. Va. 1912) (same). *But see, e.g., Francis v. Pritchett*, 278 S.W.2d 288, 290 (Tex. Civ. App. 1955) ("It must be noticed that a shut-in well is not being produced — in other words, a producing well is one where the product therefrom is being sold in the market.").

¶ 32 And it is a rule that accommodates the economic realities of the oil and gas industry. *See McVicker v. Horn, Robinson & Nathan*, 322 P.2d 410, 412-13 (Okla. 1958) ("[T]he distinction between producing and marketing . . . inheres in the nature of the oil and gas business . . . ."); *Greene*, 689 S.W.2d at 606 ("[T]o have adopted the appellees' view would have meant that even had Greene and Anderson been pumping 100 barrels of oil a day from the well during the entire duration of the lease, they still would have lost their leasehold interest . . . had oil not been flowing on October 23, 1982. Under the appellees' interpretation, a single mechanical failure could have stripped the appellants of their interest had it happened to have fallen on the wrong day.").

## D. The Commercial Discovery Rule
## Protects Lessees and Lessors

¶ 33    Undeterred, Boulder argues that the commercial discovery rule is bad law because the primary purpose of an oil and gas lease is to generate revenue, so a lessee should not be allowed to hold a lease by commercial discovery without some royalty-generating activity. We agree with Boulder's premise but not its conclusion.

¶ 34    The commercial discovery rule protects lessees who have invested millions of dollars in oil and gas development from losing that investment due to temporary extraction pauses. At the same time, the rule by no means deprives lessors of their rights to royalty-generating activity. As explained below, lessor interests are already protected by the common law duty to market.

¶ 35    There are four covenants implied in every oil and gas lease. *Garman*, 886 P.2d at 659; *Davis II*, 837 P.2d at 222. One such covenant is the covenant to operate prudently. *Garman*, 886 P.2d at 659. "Contained within the covenant to operate prudently is the duty to market the product." *Davis II*, 837 P.2d at 222. This duty "obligates the lessee to engage in marketing efforts which 'would be reasonably expected of all operators of ordinary prudence, having

17

regard to the interests of both lessor and lessee.'" *Garman*, 886 P.2d at 659 (quoting *Davis I*, 808 P.2d at 363).  A lessee may not "hold his lease indefinitely while no product from the lease is being marketed and while diligent efforts are not being made to accomplish this."  *Davis II*, 837 P.2d at 223.

¶ 36    Thus, lessors are already protected against lessees who fail to generate royalties.  The commercial discovery rule simply protects lessees from large financial losses on properties that have fully functioning, producing wells, but that sustain a temporary pause in extraction and marketing.

¶ 37    The amici argue that the implied duty to market "unreasonably complicates the leasing process."  To be sure, an equitable factor-based test is always more complicated than a yes/no solution like the one advocated by the amici.  In this context, however, the factor-based test is also fairer, allowing lessees a reasonable amount of time to market the product, without allowing them to sit on their hands too long.  In any event, the law of the implied duty to market constitutes binding precedent from the Colorado Supreme Court, which we are not at liberty to ignore.  We decide opinions within the legal framework laid down by our

supreme court. *See People v. Allen*, 111 P.3d 518, 520 (Colo. App. 2004).

E. The Hayley and Henderson Wells Never Stopped Producing

¶ 38 It is undisputed that, at all times relevant to the dispute, there remained a commercially viable discovery of oil and gas at the wells under the Haley and Henderson leases. The Kentucky Supreme Court's apt reflection in *Hutchinson v. Schneeberger* is applicable here: "The oil was there and all parties knew it." 374 S.W.2d 483, 486 (Ky. 1964). Because, in Colorado, production is satisfied by a "discovery in commercial quantities," *Davis II*, 837 P.2d at 222, the Haley and Henderson wells never stopped producing.

¶ 39 Therefore, the district court correctly concluded that the Haley and Henderson leases never terminated and properly granted summary judgment to Crestone on that basis.

¶ 40 Because of our disposition, we need not address the district court's alternative bases for granting summary judgment and Boulder's corresponding claims of error.

III. Conclusion

¶ 41 The district court's judgment is affirmed.

JUDGE TOW and JUDGE TAUBMAN concur.

19