## No. C-292

**L. N. Hagood v. John H. Heckers, Executive Director, Colorado Department of Revenue and Mary C. Hagood v. John H. Heckers, Executive Director, Colorado Department of Revenue, Amoco Production Company**
(513 P.2d 208)

Decided August 20, 1973.

Fairfield and Woods, Peter F. Brietenstein, for petitioners.

John P. Moore, Attorney General, John E. Bush, Deputy, Bernard S. Kamine, Assistant, for respondent.

V. C. McClintock, Roscoe Walker, Jr., Kerry R. Brittain, Gorsuch, Kirgis, Campbell, Walker and Grover, for amicus curiae.

*En Banc.*

MR. CHIEF JUSTICE PRINGLE delivered the opinion of the Court.

Petitioners L. N. Hagood and Mary Hagood, plaintiffs below, brought separate actions to recover Colorado normal income taxes for 1965 through 1968 assessed against them as nonresident taxpayers under 1965 Perm. Supp., C.R.S. 1963,

138-1-15. Suit was filed naming John H. Heckers, Executive Director of the Colorado Department of Revenue, as defendant. Heckers will be referred to as Director or respondent. The disputed income was paid to and received by petitioners outside Colorado pursuant to royalty agreements in conjunction with assignments of federal oil and gas leases.

In the trial court the parties stipulated to the controlling facts. Commencing in 1940, the United States Department of Interior granted to the petitioners, Wyoming residents for the tax years in question, five noncompetitive oil and gas leases covering federal lands located in Colorado. Each lease was granted pursuant and subject to the Mineral Leasing Act, 30 U.S.C. § § 181, *et seq.,* as amended. Prior to the tax years in question, by separate written agreements approved by the Department of Interior, petitioners assigned their rights and interest to the leases in question to various parties; consideration for the assignments consisted of certain immediate cash payments and future overriding royalties based on a percentage of the market value of the oil and gas which might be produced, saved and marketed from the leased premises.

Payments based upon the overriding royalty agreements were subsequently paid by the assignees and received by petitioners. Petitioners paid no income tax on the royalties. The Colorado Department of Revenue, by Notices of Deficiency dated October 18, 1968, asserted petitioners owed Colorado normal income tax on the disputed income, plus interest, for 1965 and 1966. Pursuant to 1965 Perm. Supp., C.R.S. 1963, 138-9-2, petitioners filed protests to the Department's Notices of Deficiency. By Final Determination dated March 24, 1969, the Department denied petitioners' protests and determined that they owed Colorado normal income taxes on the disputed income and interest in the total amount of $2,491.42. Petitioners did not appeal from the Director's Final Determination, but paid the total assessed deficiency to the Department under protest. Later, petitioners filed their respective refund claims with the Department to recover their taxes and interest paid under protest. On June 16, 1969, the Department ruled it would take no action

on petitioner's refund claims. Thereafter, on December 18, 1969, petitioners paid under protest an additional $2,353.44 for Colorado normal income taxes on the disputed income, including interest, assessed for 1967 and 1968.

On August 22, 1969, petitioners brought separate tax refund suits against the Director pursuant to 1967 Perm. Supp., C.R.S. 1963, 138-9-7 to recover the taxes paid for the years 1965 and 1966. These suits were consolidated, and by stipulation approved by the trial court dated September 16, 1970, the parties agreed that the trial court, by summary judgment, was to determine the taxpayers' refund claims for the years 1967 and 1968 as well as the 1965 and 1966 claims. The trial court entered summary judgment in favor of petitioners. Based upon what it determined to be controlling principles of federal law, the trial court held that the disputed income was not subject to Colorado normal income tax because such income was not derived from nor attributable to taxpayers' ownership of any interest in real or tangible personal property in Colorado, as required by the taxing statute. The court directed the repayment to the taxpayers of the collected taxes, plus interest, for the tax years 1965-1968.

On appeal, the Court of Appeals reversed the determination of the trial court. *Hagood v. Heckers,* 31 Colo. App. 172, 502 P.2d 961. The court there held that the characterization of the disputed income must be determined without regard to federal statutes and the federal leases, which leases had the effect only of delineating the rights and relationships between the contracting parties. Following common law principles applicable to private oil and gas leases, the Court of Appeals determined the retained royalty interest to be an interest in tangible property, and thus taxable under the statute in question.

This court granted certiorari to the Court of Appeals on the following issues: (1) To characterize the nature of the overriding royalty reserved by petitioners, must reference be made to federal interpretations of the interest in question, or may such a determination be based solely upon state

common law construction of the nature of the interest? (2) Is the overriding royalty an interest in real or tangible personal property in Colorado so as to be taxable under the Colorado nonresident income tax statute?

■ We hold that (1) federal law is not determinative of the characterization of the interests in question, and (2) the overriding royalty interest, for purposes of the state taxing statute, should be considered an interest in real property. We therefore affirm the judgment of the Court of Appeals.

I.

The relevant portions of the Colorado nonresident income tax statute, 1965 Perm. Supp., C.R.S. 1963, 138-1-15, read as follows:

"138-1-15. *Colorado taxable income of a nonresident individual.* (1) The Colorado taxable income of a nonresident individual shall be his nonresident Colorado adjusted gross income . . . (2)(a) Nonresident Colorado adjusted gross income means that part of the individual's federal adjusted gross income . . . derived from sources within Colorado . . . . Federal adjusted gross income of an individual shall be considered derived from sources within Colorado when such income is attributable to: . . . (b) The ownership of any interest in *real or tangible personal property* in Colorado . . . ." (Emphasis added.)

It is the definition of "real or tangible personal property" which serves as the basis for dispute in this suit.

Petitioner contends that, as the oil and gas generating the income in question is derived from lands within the federal public domain, subject to the conditions and restrictions imposed by the Mineral Leasing Act, *supra,* the effect of petitioners' assignments of leases must be determined with respect to federal law. Specifically, petitioners contend that under federal law, the rights reserved by petitioners following assignment of the leases were not "real or tangible personal property" within the context of the taxing statute. The Director contends that federal law is not relevant to the characterization of the rights in question when dealing with these interests for purposes of state taxation. To determine

whether reference must be made to federal law in construing "real or tangible personal property," we must first examine the federal statutory scheme in question to determine whether an issue of federal preemption arises.

Prior to 1920, the right to explore for and to produce oil from the public domain was subject to the placer mining laws of the United States. See Act of May 10, 1872, 17 Stat. 91, 30 U.S.C. § § 22-42; Act of February 11, 1897, 29 Stat. 526. Persons who made a proper placer location were permitted to develop the property for oil and gas purposes and, on proof of valuable discovery, could secure patent from the United States to the lands covered by the claim. Such patent conveyed full title to the land, and no interest in the land or production from the land was retained by the United States. *United States v. Marshall Silver Min. Co.*, 129 U.S. 579, 9 S.Ct. 343, 32 L.Ed. 734. The Mineral Leasing Act of 1920, 30 U.S.C. § § 181-263, represented a decisive departure from the mining location laws. Briefly, the Act created a system whereby lands valuable for certain minerals, including oil, which were in the public domain at the time of the Act, were no longer alienable in fee to private citizens. The Act contained provisions whereby applicants following prescribed regulations were granted leases on tracts of land within the public domain. In return for the privilege of developing the lands for the enumerated minerals, the applicants were to pay a royalty to the United States proportional to the production from the leased lands.

Although the Act comprehensively regulates various aspects of the leasing process, no claim has been made by petitioners that Congress intended *exclusive* control over federal lands leased for oil and gas development. Section 189 of the Act states as follows:

"§ 189. *Rules and regulations; boundary lines; State rights unaffected; taxation.*

"The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter . . . . Nothing in this chapter shall be

construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, or assets of any lessee of the United States."

Thus, by federal statute, the power of the states to tax income generated from federal lands under the jurisdiction of the Mineral Leasing Act is recognized. *See Mid-Northern Co. v. Montana,* 268 U.S. 45, 45 S.Ct. 440, 69 L.Ed. 841.

Petitioner argues, however, that, even though the states were given the right to levy an income tax on production from lands in question, construction of the incidents of such a tax must be determined in light of federal law. Petitioner correctly asserts that the Mineral Leasing Act has created an extensive regulatory system to assignments of lands within the jurisdiction of the Act. Due to the pervasiveness of federal regulation in the area of assignments and Interior Department decisions interpreting the property rights devolving from such assignments, petitioner contends that characterization of the property rights in question for purposes of state taxation must necessarily be determined by reference to the federal interpretations. We do not agree.

## II.

Petitioner's contention regarding the doctrine of federal preemption necessitates a two-fold inquiry. First, accepting the specific pronouncement in the federal statute confirming the state's right to levy an income tax, has Congress determined that, with respect to the narrow field of rights and interests created by *assignment* of such leases, federal law exclusively define such rights? If not, a second inquiry is necessary: does a state construction of the incidents of taxation in contravention with the federal construction of such rights create such a conflict or interference with the federal scheme so as to invoke the preemption doctrine?

■ When the Congress has explicitly or impliedly "occupied the entire field" on a matter in which there is a federal interest, the state is obviously precluded from legislating therein. *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7

L.Ed.2d 299; *Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640; *Hines v. Daudowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581. In order to determine whether such a pervasive Congressional scheme exists here, we must examine the regulatory scheme for assignments promulgated under the Mineral Leasing Act.

Section 187 of the Act states that the consent of the Secretary of the Department of the Interior is necessary for the assignment of any oil and gas lease on lands within the jurisdiction of the Act. The purpose of such consent is to assure that the assignment complies with federal rules and regulations of a procedural nature and to ascertain whether the assignee meets the statutory requirements as to citizenship and acreage holding limitations. *See American Sodium Company v. Shelly,* 51 Nev. 344, 276 P. 11. Once the assignments have been approved, the assignor is released and discharged from all obligations to the United States prescribed in the initial lease. 30 U.S.C. § 187a.

Pursuant to the authorization contained in Section 189 of the Act, set forth above, various Interior Department decisions have further delineated the rights of the assignor and assignee vis-a-vis the federal government. Primary among these is the *Etz* decision, 58 I.D. 712, which held that, upon approval of assignment by the Department of Interior, assignees acquired the same position as if the leases had been issued to them originally. *See also Sorrell,* 59 I.D. 278.

On the basis of these statutory provisions and Interior Department decisions, petitioners contend that no interest in real or tangible personal property could have been reserved by the assignors so as to create a taxable incident under the Colorado taxing statute. However, we do not view these statutory provisions, nor the cited Interior Department decisions, as necessarily defining the property rights in question for purposes other than interpretation of the rights of assignors and assignees with respect to the federal government.

As previously noted, the rule-making power of the Secretary of the Interior in creating regulations pursuant to

the assignment provisions of the Act is specifically limited by Section 189 of the Act, *supra,* which provides that nothing in the sections referred to and to which the Secretary may promulgate regulations shall be construed to or held to affect the rights of the states to exercise the rights which they may have, including the power to tax improvements or output of lands in question. Without a more explicit showing that the statutory provisions and regulations promulgated thereunder were meant to *exclusively* define property interests *for all purposes,* rather than just for the purposes of effectuating transfer of the leases in question, we cannot presume that Congress had such an intendment.

■ Case law dealing with the matter of exclusive control of federal lands by the federal government consistently holds that state law and state police power extend over the federal domain unless and until Congress has determined to deal exclusively with the subject. *Texas Oil and Gas Corp. v. Phillips Petroleum Co.,* 277 F. Supp. 366; *State of Colorado v. Toll,* 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927; *McKelvy v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301; *International Bridge Co. v. People of the State of New York,* 254 U.S. 126, 41 S.Ct. 56, 65 L.Ed. 176. We find no indication of such an intendment in this area.

### III.

We next consider the second prong of the preemption question. Aside from those cases in which the Supreme Court has recognized that federal preemption may occur due to a Congressional intendment to exclusively "occupy the field" regarding a particular subject, the Supreme Court has also determined that, in certain situations where state law significantly "conflicts" or "interferes" with the operation of a federal law, the state law is unenforceable. *See, e.g., Castle v. Hayes Freight Lines, Inc.,* 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68; *Franklin National Bank v. New York,* 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767. In this instance, we are not dealing with a state statute which, if enforced, will directly contradict a federal statute; rather, we must determine whether a state common law interpretation of a taxing

incident is so contrary to the gloss imposed upon a federal statutory scheme as to create an irreconcilable conflict or interference with the federal scheme. *Wallis v. Pan American Petroleum Corporation,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369. We thus view the question of the applicability of the state common law construction of the taxing incident in light of this standard.

To determine whether a significant conflict exists, we first construe the state statute in light of state common law to determine whether a potential conflict exists between federal policy and state law. *See Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233. In interpreting the property interest in question, the Court of Appeals' decision held that petitioners retained an interest in "tangible property" for purposes of the taxing statute. Such a determination is ambiguous, as the taxing statute requires an interest in either "real or tangible personal property." We construe the decision as holding that petitioners retained an interest in real property for purposes of the taxing statute, and agree with the Court of Appeals that state common law would lead to such an interpretation.

With respect to private oil and gas leases, an overriding royalty interest has been defined as a given interest severed out of the working interest or lessee's share of the oil, not to be charged with any of the cost or expense of development or operation. *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334; *Thornburgh v. Cole,* 201 Okla. 609, 207 P.2d 1096. Legal characterization of the nature of a private overriding royalty has varied with respect to the initial characterization of the oil and gas lease. The majority rule in western states appears to favor interpretation of the lessee's interest in the oil and gas lease as an interest in real estate. *Bolack v. Hedges,* 56 N.M. 92, 240 P.2d 844 (N.M. lease); *Carroll v. Holliman,* 336 F.2d 425 (Tex. lease); *Callahan v. Martin,* 3 Cal.2d 11, 43 P.2d 788. And in most states which so characterize the oil and gas lease, the granting or reservation of an overriding royalty interest is also characterized as an interest in real estate -- the overriding

royalty is viewed as merely being severed from the lessee's property interest. *See, e.g., Denver Joint Land Bank v. Dixon,* 57 Wyo. 523, 122 P.2d 842; *Phillips Pet. Co. v. Taylor,* 116 F.2d 994; *Colquitt v. Eureka Prod. Co.,* 63 S.W.2d 1018 (Tex.); *William and Meyers, Oil and Gas Law* § 214 (1972). We think this is the better rule and adopt it as the law of Colorado.

We find no reason to make an exception to this rule where the overriding royalty is related to an oil and gas lease granted pursuant to the Federal Mineral Leasing Act, *supra,* as distinguished from such a lease on private lands. Even assuming, *arguendo,* as do petitioners, that an assignor's right to retain interests upon assignment is more restricted in the instance of federal leases than is the case in private lease transfer, such restriction deals with the federal government's relationship with the assignor and assignee, and is not germane to the state's exercise of its power. Here, we are concerned only with the practical operation of the taxing statute on the taxpayer and the taxing entity, the state government, and not with any federal concerns. For purposes of the taxing statute, no practical distinction can be gleaned between retained rights in the output of federal and private lands. In Colorado, there is a strong presumption against interpretation of a taxing statute to create a tax exemption, *Mesa Verde Co. v. Board of County Commissioners of the County of Montezuma,* 178 Colo. 49, 495 P.2d 229; appeal dismissed (for lack of substantial federal question), 409 U.S. 810, 93 S.Ct. 69, 34 L.Ed.2d 65; and we find no compelling reason in this instance to create an exemption for those who have assigned federal rather than private leases.

Nor do we see any significant conflict between the Mineral Leasing Act or a federal policy promoted under the Act and our construction and application of the state statute so as to render the state statute unenforceable in this instance. The prime repository for federal policy in this instance is the Mineral Leasing Act and the regulations issued pursuant to the Act. *Wallis v. Pan American Corp., supra; Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694. Initially,

we note that regulations promulgated under the Act recognize overriding royalty interests are interests constituting "holdings and control" within the meaning of the acreage holding limitations imposed by the Mineral Leasing Act, 43 C.F.R. § § 3106.4,192.3(b). Thus, at least for limited purposes, the Department of Interior views the overriding royalty interest as an interest in the leasehold estate. We find nothing in the Act which discloses that construction of an overriding royalty as an interest in real property for state tax purposes would in any way impede the federal government's interest in expediting assignment of its leases.

The assignment procedure is in no way hindered by the state's collateral definition and nothing within the Act reveals the necessity of consistent interpretation of the rights in question. We also note that there are numerous instances in which state law has controlled issues arising in conjunction with federal oil and gas leases. *Ohmart v. Dennis,* 188 Neb. 260, 196 N.W.2d 181 (application of state pooling laws to federal oil and gas leases); *McKee v. Interstate Oil and Gas Co.,* 77 Okla. 260, 188 P. 109 (application of state mortgage procedure to the interest of a federal oil and gas lessee on Indian lands); *Dame v. Mileski,* 80 Wyo. 156, 340 P.2d 205 (application of state recording statutes to federal oil and gas leases).

In summary, in the absence of any federal policy to exclusively "occupy the field" in defining the rights involved in the case at bar or any significant conflict with a federal statute or policy, we conclude that the state is free to define the interest involved as an interest in real property for purposes of the taxing statute. Therefore, the judgment of the Court of Appeals is affirmed.

MR. JUSTICE GROVES does not participate.